IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Virginia B. Jeffcoat, )<br>          Plaintiff, )<br> )<br>     vs. )<br> )<br>Michael J. Astrue, )<br>Commissioner of Social Security, )<br> )<br>          Defendant. )<br>_____ ) | Civil Action No. 6:09-123-HMH-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff initially applied for disability insurance benefits in 2001 and 2003, alleging disability as of June 4, 2000. Both claims were denied initially and the plaintiff did not pursue further administrative appeals.[2]

_____

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2]The plaintiff previously applied for disability insurance benefits in 2001 and 2003, also alleging disability since June 4, 2000 (Tr. 63-65, 93). Both claims were denied initially and the plaintiff did not pursue any further administrative appeals, so those decisions became final (Tr. 34, 37-41, 93-
(continued...)

The plaintiff filed an application for disability insurance benefits (DIB) on July 9, 2004, alleging that she became unable to work on June 4, 2000. The application was denied initially and on reconsideration by the Social Security Administration. On November 25, 2005, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her attorney, and a vocational expert appeared on June 26, 2007, considered the case *de novo*, and on September 20, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 21, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant last met the insured status requirements of the Social Security Act on September 30, 2005.
>
> (2)     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 4, 2000, through her date last insured of September 30, 2005 (20 CFR 404.1520(b) and 404.1471 *et seq.*).
>
> (3)     Through the date last insured, the claimant had the following severe impairments: residuals from a slip and fall injury with annular tear and status post annuloplasty, degenerative disc disease, chronic pain syndrome, and depression (20 CFR 404.1520(c)).
>
> (4)     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part

[2](...continued)

94). The date of the most recent final decision (the initial denial of the 2003 application) was December 5, 2003 (Tr. 34). The plaintiff's current claim for benefits would ordinarily be subject to the doctrine of administrative *res judicata* through December 5, 2003. *See* 20 C.F.R. § 404.957(c)(1) (2008). However, the administrative law judge for the current claim did not mention the prior applications in his decision, and adjudicated the plaintiff's disability status back to June 4, 2000 (Tr. 13), so the court will address the entire period in this report.

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the following residual functional capacity: she is limited to simple, routine light exertional work in a low stress environment that does not involve interaction with the public; she can only occasionally balance, stoop, kneel, crouch, and crawl; she can perform occasional overhead work with the left arm; and she must avoid hazards such as unprotected heights and dangerous machinery.

(6)     Through the date last insured, the claimant was unable to perform her past relevant work (20 CFR 404.1565).

(7)     The claimant was born on June 25, 1962, and she is currently 45 years old, which is defined as a younger individual age 18-49 (20 CFR 404.1563).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Appendix 2).

(10)    Through the [date] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

(11)    The claimant was not under a disability as defined in the Social Security Act, at any time from June 4, 2000, the alleged onset date, through September 30, 2005, the date last insured (20 CFR 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

**<u>APPLICABLE LAW</u>**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The record reveals that the plaintiff has a high school education (Tr. 145). She has past relevant work experience as a cook and cashier in fast food establishments, and as a cook supervisor in a Shoney's restaurant (Tr. 96, 113-15, 141). She alleges disability due to residual effects of back, right leg and left arm injuries sustained when she fell at work on June 4, 2000 (Tr. 140).[3] The plaintiff was 43 years old when her insured status expired on September 30, 2005 (Tr. 77).

*Relevant Medical Evidence*

In August 2000, the plaintiff presented to spine specialist Dr. Jeffrey K. Wingate and reported that on June 4, 2000, she walked into the restaurant's cooler, slipped in a puddle of water, and fell. She complained of neck, left arm and low back pain related to the fall. She told Dr. Wingate that she had gone to an emergency room and received pain medication and a left arm sling (which she had never taken off). The plaintiff claimed that she could not stand or sit for more than a few minutes at a time and walked with a "very cautious gait." X-rays of her entire spine were normal. On examination, Dr. Wingate observed "extreme, almost bizarre, pain type behavior. She is laying on the table and moaning. She is able to stand and walk, but with a slow gait. There is no specific antalgia to her gait." She had extreme tenderness to light palpation, and a depressed affect. Neurological examination was predominantly normal and, despite claiming to have paresthesias (altered sensation) in her left hand, she had no loss of sensation to pinprick. Dr. Wingate diagnosed a "frozen" left shoulder secondary to excess usage of a sling, left C6 radiculopathy (pain related to a nerve problem), and lower back pain possibly due to an annular tear (a tear in the tough outer portion of a disc). He noted that the plaintiff had

---

[3]The plaintiff also alleged disability due to headaches, hypertension and lupus. However, the ALJ found these impairments were not "severe" and the plaintiff does not contest that finding in her brief.

"severe complaints of pain, not much in the way of physical findings," and suggested psychological intervention (Tr. 236-38).

Later that month, an MRI of the plaintiff's cervical spine revealed degenerative disc disease causing neural foraminal stenosis (narrowing of the canal through which the nerves exit the spinal column) at C3-4 and C4-5, and narrowing of the spinal canal at C4-5 (Tr. 259). An MRI of the plaintiff's lumbar spine revealed early degenerative changes, but was otherwise negative (Tr. 258). In September 2000, Dr. Wingate assessed left shoulder impingement and adjusted her medications (Tr. 235).

The plaintiff received a lumbar epidural steroid injection in October 2000 (Tr. 255). The next month, she said that her neck and left shoulder felt better, and that her low back pain had improved somewhat. Dr. Wingate noted that the plaintiff walked out of the office without a limp. He assessed a four percent impairment rating, and opined that the plaintiff "should be able at this point to return to any type of light duty that is available" (Tr. 233-34).

The plaintiff returned to Dr. Wingate in January 2001 complaining that she was in pain throughout her entire spine, pelvis, and right leg. After the examination proved unremarkable, Dr. Wingate diagnosed "[n]eck and back pain with psychological overlay." He referred her to a psychiatrist (Tr. 232).

In August 2001, the plaintiff presented to Dr. Wingate's colleague, spine specialist Dr. Leonard E. Forrest, and reported worsening pain in her low back and right leg. She said that she used a cane because her right leg would "give way." On examination, Dr. Forrest noted that "[p]ain certainly seems to be a major factor" despite the lack of any true neurologic weakness. He recommended conservative treatment. He suspected that the plaintiff's condition had worsened since November 2000, and he did "not presently feel that she [was] capable of working" (Tr. 229-31).

The plaintiff next returned to Dr. Forrest in February 2003, after an 18-month absence. She claimed that her pain had continued to worsen and that she had sought emergency care.[4] She complained of pain in her upper and lower back, neck, both legs, and left shoulder and arm (Tr. 228). Subsequently, an MRI of her cervical spine showed a disc protrusion at C4-5, more prominent on the left (Tr. 257). An MRI of her lumbar spine revealed no evidence of disc bulging, although an element of neural foraminal stenosis on the left side of L4-5 could not be ruled out (Tr. 256). Dr. Forrest provided epidural steroid injections in her neck and lower back (Tr. 253-54). The plaintiff reported some benefit with the neck injections (Tr. 225, 226).

In March 2003, the plaintiff presented to orthopedist Dr. James D. Dalton, Jr., at the request of her attorney, for evaluation of her left shoulder pain. Dr. Dalton remarked as follows on her behavior:

> She exhibited behavior during entire encounter. The first portion of the exam was notable for her inability to understand simple instructions that I gave her, such as raising her arm and externally rotating her arms with elbows at the side. I demonstrated this for her, yet she still was uncooperative with that portion of the exam. She was constantly trying to withdraw from my reach and had hypersensitivity to light touch in the skin over her shoulders.
> . . . .
> I believe her pain is probably related to her cervical disc. I am somewhat handicapped by her cooperation with my exam today. . . . She certainly has an unusual amount of pain in an otherwise normal appearing shoulder despite the limitations of my exam.

(Tr. 153).

In April 2003, an MRI of the plaintiff's left shoulder revealed minimal tendonopathy and was otherwise unremarkable (Tr. 155).

---

[4]The record contains records of various emergency room visits for pain complaints between March 2002 and January 2004 (Tr. 173-95).

In June 2003, electrodiagnostic studies of the plaintiff's extremities were normal (Tr. 239). Dr. Forrest noted that while she had some physical abnormalities, there was "none to the extent that she should be doing so poorly" (Tr. 224). He pointed out that "[n]one of these [neck problems] would be consistent with causing radiculopathy," and that despite some lumbar degenerative changes, there was no evidence of any lumbar nerve compromise (Tr. 239).

The following month, a CT scan of the plaintiff's lumbar spine revealed an annular tear on the left side at L4-5 (Tr. 247). The plaintiff underwent a functional capacity evaluation and tested "with capabilities for almost no activity," although Dr. Forrest noted that the she "self limited on 2 o[f] the 4 tasks, so there is definitely at least a question of effort" (Tr. 223, *see* Tr. 158-67 (evaluation results)). Dr. Forrest noted that he "d[id no]t have findings to support such a level of prominent pain." Nevertheless, Dr. Forrest recommended decompression to seal the annular tear and repair the contours of the annulus (Tr. 222-23).

In September 2003, state agency physician Dr. Robert D. Kukla reviewed the plaintiff's medical records in connection with her prior claim for benefits and opined that she could lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours and sit about six hours during an eight-hour workday; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds (Tr. 340-41).

In October 2003, the plaintiff underwent an intradiscal electrothermal ("IDET") annuloplasty[5] (Tr. 251). The annuloplasty was deemed successful (Tr. 214, 248), but the

---

[5]An IDET annuloplasty is a recently developed, minimally invasive procedure in which a heated wire or catheter is passed into the disc for several minutes. The heat is intended to seal any ruptures in the disc wall and may also burn nerve endings, making the area less sensitive to pain. *See* Pain Treatment Center *Intradiscal Electrotheramal Annuloplasty*, available at http://www. paintreatmentcenter.com/intradiscal_electrothermal_annuloplasty.htm.

plaintiff returned to Dr. Forrest and complained of ongoing back pain (Tr. 218). Dr. Forrest noted that she was being overly active too soon after the annuloplasty (Tr. 218). He stated that she was "having a rough time psychologically dealing with all of this right now," and recommended that she see a chronic pain psychologist (Tr. 218).

In November 2003, the plaintiff underwent a consultative evaluation by psychiatrist Dr. Pravina B. Sheth. The plaintiff said that she became easily aggravated and rated her pain as 10 on a 1-10 scale (10 being the worst pain). Dr. Sheth noted that the plaintiff initially "did not complain about depression, but when I enquired she rated her depression as 8-9." The plaintiff reported that she did activities of daily living in the morning, read books, watched television, did crossword puzzles, and sat on the porch. She said that she did not cook, but might make a sandwich, salad, tea or Kool-Aid. She also said that she would put clothes in the washer and sweep the floor at times, though she might not finish these activities if she did not feel like it. She said that she did not go shopping much, but might go to Wal-Mart and use the riding chair. She also said that she would drive to the store to get a few items. Dr. Sheth observed that the plaintiff "had need to talk about her back pain, and she constantly over and over talked about feeling bad" about not being able to engage in normal activities. On examination, the plaintiff exhibited a sad mood and an irritable affect; was well-oriented to time, place, and person; her memory was well-preserved; and her judgment and insight were poor. Dr. Sheth diagnosed depression NOS (not otherwise specified) and chronic back pain of unknown etiology. She concluded that the plaintiff's cognitive functions were "well preserved" (Tr. 162-72).

In February 2004, the plaintiff presented to psychologist L. Randolph Waid, Ph.D., for an evaluation at the request of Dr. Forrest. Dr. Waid noted that "[a] structured symptom review failed to reveal any complaints with sensory perceptual functions," and observed that there was no evidence of paralysis even though the plaintiff complained of right leg weakness. The plaintiff said that she did not "want to be bothered with things" and

10

mostly stayed home. She denied any phobia symptoms, hallucinations, psychotic symptoms, history of psychiatric illness, or need for formal treatment, but alleged difficulty getting along with her husband, family, and friends due to her irritability. Dr. Waid noted that the plaintiff's "pain interfered with her ability to fully meet the demands of extended testing," but that she was able to complete a depression inventory and pain inventory. Overall, her responses on the tests revealed her to be "highly endorsing of chronic pain and depressive symptomatology." Dr. Waid observed that she "appeared to be highly focused on her pain difficulties," and that she would benefit from psychological or behavioral intervention and antidepressants. He diagnosed pain disorder associated with both psychological factors and general medical condition[6] and depressive disorder NOS (Tr. 267-69).

At follow-up visits with Dr. Forrest through September 2004, the plaintiff continued to complain of prominent pain. Dr. Forrest noted that the "most important diagnosis here is probably benign chronic pain syndrome[7]. . . . [She] certainly seems to have symptoms and problems beyond the degree of her physical abnormalities" (Tr. 213). He recommended pain management (Tr. 212-17).

---

[6]"Pain disorder is one of several somatoform disorders. . . . The term 'somatoform' means that symptoms are physical but are not entirely understood as a consequence of a general medical condition or as the direct effects of a substance, such as a drug. Pain in one or more anatomical sites is the predominant complaint and is severe enough to require medical or therapeutic intervention. Pain disorder is classified as a mental disorder because psychological factors play an important role in the onset, severity, worsening, or maintenance of pain." *Encyclopedia of Mental Disorders: Pain Disorder*, available at http://www.minddisorders.com/Ob-Ps/Paindisorder.html. Cognitive-behavioral therapy and antidepressants are the most continually effective treatment regimen. *See id.*

[7]"Chronic pain syndrome consists of chronic anxiety and depression, anger, and changed lifestyle, all with a variable but significant level of genuine neurologically based pain." *Health Encyclopedia– Disease and Conditions Chronic Pain Syndrome* available at http://www.healthscout.com/ency/68/629/main.html. Diagnosis is often based on (1) chronic complaints of pain; (2) symptoms frequently exceeding signs on physical exam; (3) minimal relief with standard treatment; (4) history of having seen several physicians; and (5) frequent use of several nonspecific medications. *See id.*

The plaintiff returned to Dr. Waid in October 2004 for treatment. Dr. Waid provided imagery-based relaxation tapes and recommended medication adjustments, including the addition of Zoloft (an antidepressant) (Tr. 265-66).

Also in October 2004, Dr. Forrest completed a questionnaire at the request of the plaintiff's attorney, in which he opined, "I believe that [Plaintiff] may be able to work at a sedentary level on a part-time basis but I don't believe she will be able to work full[-]time or beyond sedentary." He also opined that, as a result of her fall, she had "lost more than 50% of the functional use of [her] back to do work and that she [was] totally and permanently disabled from all gainful employment." He then indicated that he was releasing the plaintiff from medical care, but that she would need "chronic pain m[anagement] including psychology as needed" (Tr. 377-78, *see* Tr. 379-80).

The following month, the plaintiff reported that Zoloft was helping. Dr. Waid thought that her pain would likely persist, but that she could "function in an improved manner with appropriate medication intervention" (Tr. 263-64). He noted in December 2004 that she had "profited well" from supportive therapy, imagery-based relaxation techniques, and cognitive behavioral strategies, and discharged her (Tr. 262).

In January 2005, the plaintiff presented to Dr. Ester R. Hare for a consultative evaluation in connection with her application for benefits. She reported temporary pain relief from steroid injections, and complained of right knee pain and depression. On examination, she had full range of motion in her neck, back, and all four extremities, and she was able to get on and off the exam table without assistance, but used a cane to walk "because of the back pain and also left shoulder pain." She was alert and fully oriented, tested normally on a mini-mental status evaluation, and had no gross neurological deficits. An x-ray of her lumbar spine was normal, and an x-ray of her left shoulder revealed possible tendonitis, but was otherwise normal (Tr. 270-74).

Two months later, in March 2005, the plaintiff underwent a consultative psychiatric examination by Dr. Anil K. Juneja, in connection with her application for benefits. The plaintiff reported that she could drive, but only did so "when she ha[d] to." She claimed that she remained in constant pain at a level of 10 on a 1-10 scale (10 being the worst pain), and that she was irritable and had diminished concentration and memory. She said that she could cook, but did not cook often, sometimes put laundry in the washer, and liked to watch television and sometimes do crossword puzzles. Dr. Juneja observed that while the plaintiff walked with a cane, she did not appear to wince in any pain and had no change in her facial expression while sitting on the sofa. Throughout the interview, the plaintiff "maintained one posture and did not change her posture at all." She also "stood up on her own and seemed to have no significant worsening in the facial expression indicating change in the pain intensity," and did not have any worsening of the pain when walking. Nevertheless, the plaintiff equated her pain to "labor pains." She exhibited normal and goal-directed speech; good eye contact; no psychomotor disturbance; an anxious, sad, and irritable mood; a constricted affect; a sense of hopelessness and helplessness; no thoughts of suicide; normal concentration; generally adequate recall; good insight and fair judgment; average intellectual abilities; the ability to do simple math without much difficulty; and no evidence of psychosis. Dr. Juneja diagnosed a mild to moderate major depressive disorder and chronic pain syndrome, and opined that the plaintiff could manage her financial affairs (Tr. 275-77).

Also in March 2005, state agency psychologist Lisa Klohn, Ph.D., reviewed the plaintiff's medical records and completed a Psychiatric Review Technique form in which she opined that the plaintiff's impairments caused "moderate" functional limitations and no episodes of decompensation. Dr. Klohn also opined that the plaintiff's impairments "would not preclude performance of unskilled work." She then assessed the plaintiff's mental

13

residual functional capacity and determined that she was "not significantly limited" in 14 of 20 functional areas (Tr. 311-16). She concluded as follows:

> [Plaintiff] is able to remember locations and work-like procedures and is able to attend to and perform simple tasks for at least two hours at a time without special supervision. She is able to understand and comply with normal work-hour requirements. She has the ability to understand and comply with basic supervisory instructions and is able to conform to requests for change in response to feedback. She is able to interact appropriately with co-workers, but will do best in situations in which she is not required to interact with the general public. She is able to respond to changes in routine and has the ability to avoid safety hazards. She is able to travel to and from work using available transportation. She can make and set appropriate work-related goals. She can make simple work-related decisions. She will do best in a low stress work situation.

(Tr. 317).

In April 2005, Dr. John M. Roberts, a psychiatrist in Dr. Waid's practice to whom Dr. Waid had referred the plaintiff in late 2004, completed a Medical Source Statement at the request of the plaintiff's attorney. In this checklist form, Dr. Roberts opined that the plaintiff had "fair" ability (defined in the form as "limited, but satisfactory") to use judgment, function independently, and handle simple job instructions. He indicated that the plaintiff had "poor" ability (defined in the form as "seriously limited but not precluded") to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention/concentration, handle detailed non-complex job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Dr. Roberts further opined that the plaintiff's low back pain "preclude[d] physical exertion (bending, lifting over 10 pounds, stooping, standing, and sitting for more than 20 minutes) in the work place." He opined that memory and concentration problems impaired her ability to follow directions or act independently, and that irritability, anxiety, and social withdrawal impaired

her ability to deal with others. Dr. Roberts opined that the plaintiff's symptoms "preclude gainful employment at this time and for the foreseeable future" (Tr. 278-80).

Orangeburg Mental Health Center records dated between July and September 2005, recorded that the plaintiff was alert, fully oriented, and groomed adequately; continued to complain of pain; had normal speech and a depressed mood; and "perseverates" on the topic of her alleged disability (Tr. 365-66).

In September 2005, state agency psychologist Samuel W. Goots, Ph.D., reviewed the plaintiff's medical records and completed a Psychiatric Review Technique form in which he opined that the plaintiff's impairments caused only "mild" to "moderate" functional limitations and no episodes of decompensation. Dr. Goots then assessed the plaintiff's mental residual functional capacity and determined that she was "not significantly limited" in 17 of 20 functional areas (Tr. 292-98).


### Other Evidence

In a Daily Activities Questionnaire completed in August 2003 in connection with her prior claim for benefits, the plaintiff described a very limited ability to sit, stand, and walk, as well as limited daily activities and social interaction (Tr. 104-07). She acknowledged that she handled the financial responsibilities for her household (Tr. 105).

An agency Report of Contact completed in December 2004 reported that the plaintiff "want[ed] to be off to herself and be left alone," sometimes did not get dressed during the day, had trouble sleeping but did not nap during the day, and did not cook "at all" (Tr. 137). She said that she watched television "all the time," read occasionally, had no hobbies, and did not go out with anyone because "people stare[d] at her like she [was] crazy" (Tr. 137). She said that she took her medication without reminders, drove occasionally for short distances, and did not shop for groceries (Tr. 137).

15

### *Hearing Testimony*

The plaintiff testified at the June 2007 administrative hearing that she required surgery "right after" she injured her back in 2000 (Tr. 397). She described her current back problems, depression, and alleged limitations in sitting, standing, and walking (Tr. 404-08, 413). She testified that she sometimes did not want to go out, go shopping, or be around anyone "because they're always talking about working" (Tr. 412). She testified that she might go to Wal-Mart once per month (Tr. 412-13), but did no housework and did not cook often (Tr. 415-16).

Also at the hearing, the ALJ asked vocational expert Feryal Jubran to consider a hypothetical individual of the plaintiff's vocational profile who was limited to work that was simple, routine, low-stress (defined as requiring few decisions), and light in exertion; involved no interaction with the public; involved no more than occasional balancing, stooping, kneeling, crouching, crawling, or working overhead with the left arm; and allowed the individual to avoid hazards such as heights and dangerous machinery (Tr. 418). Ms. Jubran testified that such an individual could not perform the plaintiff's past work, but could perform the light unskilled jobs of mail clerk (940 jobs in the state and 200,000 nationwide), routing clerk (2,700 jobs in the state and 240,000 jobs nationwide), and inspector (2,300 jobs in the state and 1.6 million nationwide), and the unskilled sedentary jobs of document preparer (1,500 jobs in the state and 130,000 nationwide), inspector (2,100 jobs in the state and 355,000 nationwide), and machine tender (800 jobs in the state and 130,000 nationwide) (Tr. 419-20).[8]

---

[8]*See* 20 C.F.R. §§ 404.1567(a) (definition of sedentary work), 404.1567(b) (definition of light work), 404.1568(a) (definition of unskilled work).

## ANALYSIS

The plaintiff was 43 years old when her Title II insured status expired on September 30, 2005. She alleges disability commencing June 4, 2000, due to depression and residual effects of back, right leg, and left arm injuries sustained when she fell at work on her alleged onset date. She has a high school education and past relevant work experience as a cook and cashier in fast food establishments and as a cook supervisor in a restaurant. The ALJ found that the plaintiff had the residual functional capacity ("RFC") for simple, routine light exertional work in a low stress environment that does not involve interaction with the public; she can only occasionally balance, stoop, kneel, crouch, and crawl; she can perform occasional overhead work with the left arm; and she must avoid hazards such as unprotected heights and dangerous machinery. The plaintiff argues that the ALJ erred by (1) failing to consider whether she met Listing 12.07 Somatoform Disorders; (2) failing to properly consider the opinions of treating physicians Drs. Roberts and Forrest; and (3) failing to include all of her impairments in the hypothetical given to the vocational expert at the hearing.

### *Listing 12.07*

The plaintiff first argues that the ALJ erred by failing to address whether she met Listing 12.07 Somatoform Disorders. The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN-99-

3696, 2000 WL 1916316, *9 (D. Md. 2000) (finding that where there is "ample factual support in the record" for a particular listing, the ALJ should perform a listing analysis).

Listing 12.07 addresses the spectrum of somatoform disorders, or physical symptoms for which there are no demonstrable organic findings. See 20 C.F.R. Pt. 404, subpt. P, app. 1, § 12.07. To meet this listing, an impairment must meet one of the following "A" criteria: (1) evidence of a history of multiple physical symptoms that have caused the individual to take medicine frequently, see a physician often, and alter life patterns significantly; or (2) disturbance of vision, speech, hearing, use of a limb, movement and its control, or sensation; or (3) unrealistic interpretation of physical signs and sensations. *See id.* § 12.07A. The criteria in § 12.07A must be accompanied by at least two of the following "B" criteria: marked restriction of daily activities; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. *See id.* § 12.07B. For all of the mental impairment listings, the functional limitations "must be the result of the mental disorder described in the diagnostic description." *Id.* § 12.00A. In other words, if a claimant has marked limitations in two areas, but those limitations are not the result of the particular mental impairment in the listing, the listing is not met.

The plaintiff specifically alleged that she met Listing 12.07 and cited evidence supporting her claim in her pre-hearing brief (Tr. 147). The ALJ, however, did not address this listed impairment in his decision. The Commissioner argues that "remand for identification of the relevant listing and explicit evaluation of the listing criteria is not required because there is not ample evidence showing that Plaintiff's impairments met a listing" (def. brief. at 13). The Commissioner agrees that the plaintiff has an "unrealistic interpretation of physical signs and sensations"; however, the Commissioner argues that the plaintiff cannot meet the "B" criteria. Specifically, the Commissioner argues that while the plaintiff's "activities and social functioning may have been limited, the evidence does not establish

18

that the limitations were of *marked* severity or *the result of her somatoform disorder*" (def. brief at 14) (emphasis in original). The Commissioner contends that the plaintiff has failed to establish any link between her limitations and her physical symptoms and notes that no physician has ever directly attributed her functional limitations to the somatoform disorder itself (def. brief at 15).

This court disagrees with the Commissioner's position. The plaintiff specifically alleged and cited evidence that she met the cited listing in her pre-hearing brief. Further, the record contains ample factual evidence in support of Listing 12.07. In particular, with regard to the "B" criteria of "marked restriction of activities of daily living," the plaintiff presented the following evidence:

> At the hearing, the Plaintiff . . . testified that she does not help with the laundry, vacuuming or dusting (Transcript p. 415). She also stated that she rarely cooks and snacks most of the time because she does not feel up to eating a meal. She stated that her daughter often has to assist her getting dressed and that many days she does not bother to even get dressed (Transcript p. 416). The Plaintiff stated that if she tries to go places like shopping with her family, she gets frustrated and ends up sitting in the car because she is not able to walk around for prolonged periods of time (Transcript p. 407).
>
> The Plaintiff's testimony is consistent with a Report of Contact dated December 10, 2004. The Plaintiff explained that her husband and daughter do most of the housework as she does not want to be bothered with any of it. The Plaintiff also stated that she stays in her night clothes all day and that she lacks an appetite most of the time (Transcript p. 137). The Plaintiff testimony at the hearing also mirrors her complaint to the Orangeburg Mental Health Center. A report from the Orangeburg Mental Health Center from February 2007 recorded that the Plaintiff "[h]as a sedentary lifestyle (watches TV all day)" (Transcript p. 347). The practitioner scored her "Grooming" as "Fair" and noted that the Plaintiff was wearing stained clothing. *Id.* The Plaintiff stated that it hurts her feelings to see other people going to work or working in the yard when she cannot. *Id.*

(Pl. brief at 6-7).

With regard to the "B" criteria of "marked difficulties in maintaining social functioning," the record contains the following evidence:

> The record demonstrates that the Plaintiff's social life has been dramatically restricted by her illness. In July 2006, a report with the Orangeburg Mental Health Center noted that the Plaintiff "has been going out to visit her daughter but admits to not staying long because of the pain she [is] in and her preference is to be home or alone because people are tired of her complaints (Transcript p. 358). The report further noted that "further treatment was needed because client continues to lack coping and some socialization skills." *Id.* In October 2006, the clinician recorded that the Plaintiff "reported one attempt to socialize but felt uncomfortable and was in too much pain to sit, talk or play cards" (Transcript p. 352).

> Dr. John M. Roberts completed a Medical Source Statement dated April 26, 2005. In the statement, he ranked the Plaintiff as poor (ability to function in this area is seriously limited but not precluded) in four categories of Personal-Social Adjustment. He noted that she had poor ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. In support of his assessment, Dr. Roberts noted that the Plaintiff has poor personal hygiene and Trichotillomania, a disorder characterized by a patient's impulse to pull out her own hair (Transcript p. 279).

> The Plaintiff testified that she isolates herself from people especially her friends because they talk about working and engage in activities that she is no longer able to engage in due to her injury (Transcript pp. 411, 412 and 413). A Report of Contact also indicated that the Plaintiff stated that she avoids going to church because she feels that people are "looking at her funny." The Plaintiff also stated that she does not go other places because "people stare at her like she is crazy and if they look at her she says things to them she doesn't mean to" (Transcript p. 137).

(Pl. brief at 7-8).

Based upon the foregoing, the ALJ should have addressed whether the plaintiff's impairments meet or equal Listing 12.07. The Commissioner's arguments are a *post-hoc* rationalization not offered by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d

912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Without the ALJ's analysis, it is impossible to determine whether the finding that the plaintiff's impairments do not meet a listing is based upon substantial evidence. Accordingly, upon remand, the ALJ should be instructed to consider whether the plaintiff's impairments meet or equal Listing 12.07 at step three of the sequential evaluation process.

### *Medical Opinions*

The plaintiff next argues that the ALJ erred in disregarding the opinions of her treating physicians, Drs. Roberts and Forrest. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the Listing requirements or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 61 Fed. Reg. 34471-01, 34474. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2);

*Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p, 61 Fed.

Reg. 34490-01, requires that an ALJ give specific reasons for the weight given to a treating

physician's medical opinion. *Id.* at 34492. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected. Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in [20 C.F.R. § 416.927]. In many cases,
> a treating source's medical opinion will be entitled to the
> greatest weight and should be adopted, even if it does not meet
> the test for controlling weight.

*Id.* at 34491.

In October 2004, Dr. Forrest completed a questionnaire in which he opined

that the plaintiff could not work full-time (or beyond a sedentary capacity), that she lost more

than 50% of the functioning in her back, and that she was "totally and permanently disabled

from all gainful employment" (Tr. 377). However, as the ALJ correctly pointed out, Dr.

Forrest's opinion was inconsistent with his own progress notes in which he stated that none

of the objective study findings were consistent with the radiculopathy the plaintiff described,

noted her improved symptoms, and noted that her chronic pain syndrome was "benign" (Tr.

22). *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (treating physician's opinion may

be rejected where "[his] own medical notes did not confirm his determination of 'disability'");

20 C.F.R. § 404.1527(d)(3)("The more a medical source presents relevant evidence to

support an opinion, particularly medical signs and laboratory findings, the more weight we

will give that opinion.").

The ALJ also correctly pointed out that Dr. Forrest's opinion was not

consistent with the findings from other sources who evaluated or treated the plaintiff around

the same time, including the physical therapist who conducted the functional capacity evaluation and noted that the plaintiff exhibited self-limiting and histrionic behavior and walked out to her car afterward with minimal assistance, and Dr. Hare, who found the plaintiff had full range of motion and no difficulty climbing on and off the exam table (Tr. 22). A physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence. *See Craig*, 76 F.3d at 590.

 In April 2005, Dr. Roberts opined that the plaintiff's back pain "preclude[d] physical exertion (bending, lifting more than 10 pounds, stooping, standing, sitting more than 20 minutes) in a work setting"; that her memory and concentration difficulties impaired her ability to follow directions, act independently or manage her own benefits; that her depression and irritability impaired her ability to deal with supervisors, co-workers, or the public; and that her symptoms "preclude[d] gainful employment at this time and for the foreseeable future" (Tr. 25; *see* Tr. 278-80).

 In his decision, the ALJ first noted that Dr. Roberts' colleague, Dr. Waid, had provided nearly all of the plaintiff's mental health care in 2004 and that the record did not show any examination findings by Dr. Roberts that would support his April 2005 opinion, particularly his opinion about the plaintiff's physical limitations (Tr. 25). *See* 20 C.F.R. § 404.1527(d)(i-ii) (factors for consideration when evaluating medical source opinions include the length of the treatment relationship and frequency of examination, as well as the nature and extent of treatment relationship). Second, the ALJ correctly observed that Dr. Roberts' assessment of the plaintiff's mental limitations was inconsistent with other medical evidence, including Dr. Juneja's objective findings regarding the plaintiff's normal concentration, adequate recall, average intelligence, good insight, and ability to perform simple math and spelling without much difficulty (Tr. 25; *see* Tr. 277).

Furthermore, as pointed out by the Commissioner, none of the other treating or consulting physicians or psychologists found the plaintiff had the degree of limitation assessed by Drs. Forrest and Roberts (*see, e.g.*, Tr. 153 (Dr. Dalton did not assess disabling limitations despite observing the plaintiff's unusual behavior); Tr. 162-72 (Dr. Sheth diagnosed depression but found the plaintiff's cognitive functions were well preserved); Tr. 233 (Dr. Wingate opined that the plaintiff could return to any light duty work); Tr. 263 (Dr. Waid felt the plaintiff could function better with appropriate medication); Tr. 267-69 (Dr. Waid found the plaintiff capable of completing depression and pain inventories despite her reportedly extreme pain); Tr. 273-74 (Dr. Hare did not assess any work-related physical limitations); Tr. 275-77 (Dr. Juneja stated the plaintiff had the mental capacity to manage her own financial affairs and did not assess any functional limitations that would preclude substantial gainful activity).  These inconsistencies warranted giving less weight to the opinions of Drs. Forrest and Roberts.  *See* 20 C.F.R. § 404.1527(d)(2) (a medical opinion's consistency with the record as a whole is considered in deciding what weight to grant the opinion).

Likewise, the opinions of Drs. Forrest and Roberts regarding the plaintiff's degree of mental and physical limitation conflicted with the findings of various state agency medical and psychological consultants, none of whom concluded after reviewing her records that the plaintiff had any disabling limitations (*see, e.g.*, Tr. 292-99 (Dr. Goots opined that the plaintiff had, at most, "moderate" mental limitations); Tr. 311-17 (Dr. Klohn opined that the plaintiff had, at most, "moderate" mental limitations); Tr. 339-46 (Dr. Kukla opined that the plaintiff could perform a limited range of medium work).

Based upon the foregoing, this allegation of error is without merit.

### Step Five Analysis

The plaintiff next alleges that the ALJ erred in not including in his hypothetical to the VE all of her impairments. The ALJ asked the vocational expert to consider a hypothetical individual of the plaintiff's vocational profile who was limited to work that was simple, routine, low-stress (defined as requiring few decisions), and light in exertion; involved no interaction with the public; involved no more than occasional balancing, stooping, kneeling, crouching, crawling, or working overhead with the left arm; and allowed the individual to avoid hazards such as heights and dangerous machinery (Tr. 418). The vocational expert testified that such an individual could not perform the plaintiff's past work, but could perform the light unskilled jobs of mail clerk, routing clerk, and inspector, and the unskilled sedentary jobs of document preparer, inspector, and machine tender (Tr. 419-20).

"[I]n order for a [VE]'s opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

The plaintiff argues as follows:

> An individual who has lost more than 50% of the functional use of her back could not possibly perform such jobs as mail clerk, routing clerk, inspector and document preparer. An individual with a poor ability to maintain attention and concentration could perform no job that exists in the national economy. Considering the severity of the Plaintiff's impairments in conjunction with her lack of education and job training, it must be concluded that substantial evidence does not support the ALJ's conclusion that the Plaintiff is able to engage in work that exists in substantial number in the national economy that accommodates her residual functional capacity and vocational factors. Since the Plaintiff is unable to engage in both her past work and other work in the national economy, she must be found disabled.

(Pl. brief at 10). However, as discussed above, the ALJ found that Dr. Forrest's opinion that the plaintiff had lost more than 50% of the functioning of her back was inconsistent with his

own progress notes and was inconsistent with the findings from other sources who evaluated or treated the plaintiff around the same time. Further, as discussed above, while Dr. Roberts opined the plaintiff had "poor ability to maintain attention/ concentration," the ALJ found that opinion was inconsistent with other evidence in the record, including a psychiatric evaluation during the same time period performed by Dr. Juneja in which the plaintiff's concentration span was found to be normal. Based upon the foregoing, this allegation of error is without merit.

### CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

April 30, 2010

Greenville, South Carolina